IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ADEN RUSFELDT, | : | |
|       Plaintiff, | : | |
| | : | |
| v. | : | Civil No. 5:23-cv-01523-JMG |
| | : | |
| CITY OF READING, *et al.*, | : | |
|       Defendants. | : | |

**MEMORANDUM OPINION**

**GALLAGHER, J.**                                                                                                              **June 10, 2024**

**I.     OVERVIEW**

Plaintiff, a religious pastor, was arrested for disorderly conduct, under 18 Pa. C.S. § 5503, across the street from a high school when the speech he was giving ascended beyond generic religious and moral utterances, and he began to personally insult minor students. Prior to his arrest, the audience threw water at him, yelled invectives, and physically grabbed at his person. Plaintiff's claims for violation of his First Amendment and Fourth Amendment rights and False Arrest fail, as the Police Officer had probable cause to arrest him for disorderly conduct involving fighting words. In the alternative, the Officer is entitled to qualified immunity.

**II.    FACTUAL BACKGROUND**

On the afternoon of January 10, 2023, near in time to school dismissal, Plaintiff, Aden Rusfeldt, pastor of the Key of David Christian Center, along with his wife, stepson, and another individual positioned themselves on a street intersection across from the Reading Senior High School. Defs.' Statement of Undisputed Facts at ¶¶ 2-5, 8-9, ECF No. 35. Upon arrival, while carrying signs bearing religious messages, Plaintiff began speaking through a megaphone and

made statements referencing his religious beliefs and advocating for the crowd to "give their life to Jesus Christ." *Id.* 10, 13; Pl. Statement of Disputed Facts at ¶ 10, ECF No. 45; Def. App. 52 (Video 00:03-:00:09). Plaintiff's wife recorded the relevant events on a handheld digital camcorder. ECF No. 35 at ¶ 12. Plaintiff continued to make statements such as "some of you are suicidal, you need God," "some of you are depressed, you need God," and "some of you are whores, you need God." Def. App. 52 (Video 00:22-:00:33). Just after the last statement, a minor female approached Plaintiff and threw water from a bottle at him. *Id.* at 00:29-00:32.

After being hit with the water, Plaintiff stated "Film that whore. Film that little slut cross the street." *Id.* at 00:35-00:40. After this personal remark, Plaintiff continued to make comments which ranged from generalized statements with uncertain applicability to comments directed at sub-groups of the student body. *Id.* at 1:35-1:37 ("some of you know that you are going to hell"), 01:12-01:15 ("nasty whores and sluts right there"). Additionally, he made comments such as "you're gonna go to hell students" that applied to the entire crowd standing before him. *Id.* at 3:27-3:29. As Plaintiff made these comments, the students in the crowd continued to throw water on him, yelled back at him, and made crude gestures toward him. *Id.* at 01:12-02:45.

Eventually members of the School District Police approached and attempted to control the situation by standing between Plaintiff and the crowd of students. *Id.* at 02:45. During the interaction, School Resources Officer Pablo Dominguez radioed on the dispatch channel and reported that people were throwing bottles at the scene. ECF No. 35 at ¶ 31. Subsequently, City of Reading Police Officer Morar arrived and exited his vehicle. *Id.* at ¶ 32. Once on scene, Officer Morar discussed the ongoing situation with Reading High School Security Officer Ruben Rodriquez, who informed him that Plaintiff was calling individual girls "whores" and "sluts" and that parents were on the way to "fight Plaintiff." Morar Dep., 68:24-25, 69:1-5, 18-24, ECF No.

46 at 73. As the two officers were conversing, Plaintiff said "go to hell lesbo dyke" into his megaphone.[1] ECF No. 45 at ¶ 36. Although Officer Morar mistakenly heard something along the lines of "go to hell lesbos." ECF No. 35 at ¶¶ 37, 104. After Plaintiff's utterance, two female students approached Plaintiff, and one of them stated "bitch, what? Oh hell no". *Id.* at ¶ 38. School Security Officers intercepted and redirected these students. *Id.* at ¶ 40.

Officer Morar then approached Plaintiff and warned him that if he continues "ril[ing] these kids up" he would be "tak[en] in." *Id.* at ¶ 46. After Plaintiff requested that Officer Morar get his supervisor, Officer Morar suggested Plaintiff relocate and speak "three, four, five blocks down." *Id.* at ¶¶ 48-52. Plaintiff vocalized he "would not leave unless [he] was dragged away in handcuffs." *Id.* at ¶ 57. At that time, Officer Morar placed Plaintiff in handcuffs and placed him in the back of a police van. *Id.* at ¶¶ 58-60. Plaintiff remained in custody for approximately 50-65 minutes. ECF No. 45 at ¶ 66. He was subsequently released without charges. ECF No. 35 at ¶ 67.

### III.   LEGAL STANDARD

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is "genuine" when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Physicians Healthsource, Inc. v. Cephalon, Inc.*, 954 F.3d 615, 618 (3d Cir. 2020). And a fact is material if "it might affect the outcome of the suit under governing law." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

---

[1] Defendants contend Plaintiff stated, "go to hell, lesbo dykes." ECF No. 35 at ¶ 38. However, Plaintiff contends he said "go to hell, lesbo dyke" in the singular form. ECF No. 45 at ¶ 36. For the purposes of summary judgment, the Court views the evidence in the light most favorable to the nonmoving party, Plaintiff, and therefore accepts Plaintiff's contention that this was a singular, personal statement. *Vaughan v. Boeing Co.*, 733 Fed. Appx. 617, 621 (3d Cir. 2018).

The party moving for summary judgment must "identify[] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). In response, the nonmoving party must then "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 192 (3d Cir. 2015) (quoting *Anderson*, 477 U.S. at 252).

In applying this standard, the court must "construe the evidence in the light most favorable to the non-moving party." *Anderson*, 477 U.S. at 255. At the summary judgment stage, the court's role is not to weigh the evidence and determine the ultimate truth of the allegations. *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 752 (3d Cir. 2019). Instead, the court's task is to determine whether there remains a genuine issue of fact for trial. *Id.*

## IV. ANALYSIS

### A. 42 U.S.C. § 1983: Violation of Constitutional Rights

Plaintiff's Complaint alleges Officer Morar deprived him of his "rights, privileges or immunities secured by the U.S. Constitution namely retaliation against freedom of speech and of religion under the First Amendment and arrest without probable cause under the Fourth Amendment." Complaint at ¶ 31, ECF No. 1. However, if Officer Morar had probable cause to arrest Plaintiff, both claims must fail. *See Gilles v. Davis*, 2004 U.S. Dist. LEXIS 28732, *19 (W.D. Pa. 2004) ("the common component to [the false arrest and First Amendment] claims is probable cause"); *Nieves v. Bartlett*, 587 U.S. 391, 397 (2019) (existence of probable cause

precludes First Amendment retaliation claims); *Dowling v. City of Philadelphia*, 855 F.2d 136, 141 (3d Cir. 1988) (element of false arrest includes arrest without probable cause).

The Court finds Defendant Officer Morar had probable cause to arrest Plaintiff for disorderly conduct and, in the alternative, if he was mistaken as to the existence of probable cause, his belief was "an objectively reasonable evaluation of clearly established law, which entitles [him] to qualified immunity from prosecution." *Gilles*, 2004 U.S. Dist. LEXIS 28732 at *19-20. The Court is guided by the analysis of the Western District of Pennsylvania in *Gilles*, which was ultimately upheld by the Third Circuit. *See Gilles v. Davis*, 427 F.3d 197, 204-205 (3d Cir. 2005).

1. **Disorderly Conduct under PA law**

Officer Morar arrested Plaintiff for disorderly conduct pursuant to Pennsylvania Criminal Code, 18 Pa. C.S. § 5503(a) which provides:

> (a) Offense defined. –A person is guilty of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he:
>   (1) Engages in fighting or threatening, or in violent or tumultuous behavior;
>   (2) Makes unreasonable noise;
>   (3) Uses obscene language, or makes an obscene gesture; or
>   (4) Creates a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor.

"Under the disorderly conduct statute, 'whether a defendants' words or acts rise to the level of disorderly conduct hinges upon whether they cause or unjustifiable risk a public disturbance.'" *Gilles*, 2004 U.S. Dist. LEXIS 28732 at *20 (quoting *Commonwealth v. Hock*, 728 A.2d 943, 946 (Pa. 1999)). Unprotected speech, such as fighting words, can constitute a disorderly conduct violation. *Id.*; *but see Johnson v. Campbell*, 332 F.3d 199, 211 (3d Cir. 2003) (stating statute must be narrowly drawn and construed to only punish unprotected speech).

## 2. First Amendment

Plaintiff alleges Officer Morar is liable under 42 U.S.C. § 1983 for retaliating against him for practicing his First Amendment right to free speech and religion. The Court disagrees.

To successfully prove a retaliation claim, a plaintiff must prove "(1) that he engaged in constitutionally-protected activity; (2) that the government responded with retaliation; and (3) that the protected activity caused the retaliation." *Eichenlaub v. Twp. Of Indiana*, 385 F.3d 274, 282 (3d Cir. 2004). The first step is for the Court to determine whether Plaintiff was engaging in constitutionally protected activity. *Id.*

The First Amendment provides broad protection for speech, and censorship and punishment are avoided as "a principal function of free speech under our system of government is to invite dispute." *Texas v. Johnson*, 491 U.S. 397, 408 (1989). However, when "shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest," speech exceeds the bounds of constitutional protection and must be limited to maintain order and protect society. *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949). As such, "the lewd and obscene, the profane, the libelous, and the insulting or 'fighting words'" are not protected under the First Amendment. *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942).

Fighting words are "those which by their very utterance inflict injury or tend to incite an immediate breach of the peace." *Cantwell v. Connecticut*, 310 U.S. 296, 309 (1940); *see also Johnson*, 491 U.S. at 409 ("to be punishable, words must do more than bother the listener; they must be nothing less than an invitation to exchange fisticuffs."). "Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution…" *Id.* at 310-11. Whether specific utterances constitute fighting words may depend

on the audience. *See City of Houston v. Hill*, 482 U.S. 451, 462 (1987) (finding a properly trained police officer reasonably expected to exercise a higher degree of restraint than the average citizen).

In *Gilles*, the Third Circuit upheld the District Courts finding of probable cause to arrest the plaintiff for disorderly conduct based on his use of fighting words. *Gilles*, 427 F.3d at 205. The plaintiff, a self-proclaimed "campus-evangelist," engaged in a mix of protected and unprotected speech on a college campus. *Id.* at 201, 205. The Third Circuit found "derogatory language generically directed to the crowd" protected, as it was not personally directed at any particular member of the audience and was not likely to incite an immediate breach of the peace. *Id.* at 205. However, the plaintiff's epithets personally directed and abusively targeted at members of the crowd were determined to be fighting words. *Id.* (finding "Christian lesbo," "lesbian for Jesus," and other phrases constituted fighting words).

In making the original determination, the District Court relied on the circumstances of the ongoing situation. The court stated that the defendant was "summoned to a 'near riot' situation, wherein the speaker was calling out individuals and insulting them with highly offensive language," which drew a large crowd of viewers that "hurl[ed] heated invectives at him, approach[ed] him, and even thr[ew] objects at him." *Gilles*, 2004 U.S. Dist. LEXIS 28732 at *26. The court found these factors gave the defendant officer reasonable belief "that fighting words were being uttered, the speaker intended to cause public inconvenience or provoke annoyance, or that he recklessly created a risk of public unruliness, tumult, and disorder." *Id.*

Here, like *Gilles*, much of Plaintiff's speech was constitutionally protected, such as his generic religious and moral declarations. Statements such as "most of you have no good idea about life," "some of you are suicidal, you need God," and even "some of you are whores" are protected speech that does not rise to the level of fighting words. *See* Def. App. 52 (Video 00:16-00:32).

7

This is because the generic nature of the statements and the uncertainty of their application makes them unlikely to cause an immediate breach of the peace. However, when Plaintiff began personally targeting minor students his speech ascended beyond First Amendment protection and inflicted injury from the moment the statements were uttered. For example, Plaintiff specifically called one minor a "whore" and "slut" and directed another member of his group to film her. *Id.* at 00:32-00:40. Later, Plaintiff stated "go to hell lesbo dyke," as police officers attempted to have students disperse from the increasingly hostile environment. *Id.* at 05:31-05:33. While the majority of Plaintiff's speech was protected, Officer Morar was justified in arresting him for disorderly conduct based on the speech that ascended into fighting words.[2]

Not only were portions of Plaintiff's speech likely to incite an immediate breach of the peace, but they in fact did so. Students threw projectiles, physically approached Plaintiff and his group, and grabbed at Plaintiff's person. His wife later reported that she believes she was hit with a bullet from a pellet gun during the interaction.[3] The situation became the perfect example of

---

[2] The Court bases its analysis on the comments personally directed to individual students. However, it also acknowledges the fine line between personally insulting an individual and directing a statement to members of a crowd with unquestioning applicability. Plaintiff called a sub-group of the crowd "nasty whores and sluts." This statement is inherently different than stating "some of you are whores and sluts" and is more likely to cause a breach of the peace, as it is akin to telling each member of the group the individual message. While the Third Circuit stated "language, when not personally directed at a particular member of the audience, is not likely to incite an immediate breach of the peace," it was reflecting on language of uncertain applicability. *See Gilles*, 427 F.3d at 205 ("by definition, there are thousands of fornicators on this campus," "drunkards are everywhere on this campus"). However, when someone addresses members of a crowd, and those members know they are the target audience, the meaning is different. Plaintiff's personal verbal attacks clearly take this case beyond the realm of protected speech, but drawing a ridged line at similar utterances runs the risk of creating an unworkable standard in future cases.

[3] Plaintiff asserts that the police officers had an obligation to arrest the minors, if anyone, for engaging in the physical aspect of the altercation. While the Court does not condone the use of violence, whether the police also had probable cause to arrest the minor students does not justify Plaintiff's use of unprotected speech or disorderly conduct.

public unruliness, tumult, and disorder. Without police intervention, the public unrest would have surely escalated, as parents of the students were reportedly en route to join the condemnation. Despite broad First Amendment protection, police officers are not forced to stand idly by and watch a physical altercation commence as a result of personally targeted insults.

### 3. Qualified Immunity

Further, Officer Morar avers he is entitled to qualified immunity. The Court agrees.

"Government officials performing discretionary functions are 'shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Gilles*, 2004 U.S. Dist. LEXIS 28732, *28 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "The Supreme Court has emphasized that the inquiry is whether a reasonable officer could have believed that his or her conduct was lawful, in light of the clearly established law and the information in the officer's possession." *Id.* (internal citations omitted). The doctrine "gives ample room for mistaken judgments" by protecting "all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224. 227 (1991).

---

Further, Plaintiff argues that the holding in *Nieves v. Bartlett* requires that Defendants' Motion be denied, since Plaintiff was arrested when other members of the crowd who engaged in prohibited conduct were not. *See Nieves v. Bartlett*, 587 U.S. 391, 407-08 (2019) (holding "no-probable-cause" requirement inapplicable when plaintiff presents "objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been."). However, Plaintiff fails to compare similarly situated individuals, and instead compares his behavior to the very students he caused to breach the peace. Requiring the arrest of members of the crowd that Plaintiff insulted would be an incomprehensible application of *Nieves*. Instead, the Supreme Court illustrated the holding with an example of a jaywalking arrest post-vocal complaint about police conduct. This example is not akin to police officers making a judgment call on how to control a near riot situation. Officer Morar was not "exploit[ing] his arrest power as a means of suppressing [Plaintiff's] speech." *Id.* at 406. Instead, he was trying to control the situation and arrested the actor who refused to comply with police directives.

Here, Officer Morar could reasonably have believed, in light of clearly established law and the information known to him, that Plaintiff's arrest was based on probable cause. While Plaintiff advocates for the overruling of *Chaplinsky v. New Hampshire*, which established the fighting words doctrine, it remains good law. *See Chaplinsky*, 315 U.S. 568 (1942). Further, the Third Circuit upheld the Middle District of Pennsylvania's finding that the defendant used fighting words in *Gilles*, a case that contains shockingly similar facts to the instant case.[4] A reasonable officer could have analyzed the instant situation, compared it to the factual circumstances of prior case law, and concluded that the matter called for an arrest for a disorderly conduct violation.

As discussed *supra*, Officer Morar arrived at a chaotic scene in which minor students were throwing water bottles, crowding Plaintiff, and at times physically grabbing his person and the signs he was holding. He was informed the interaction began with Plaintiff "calling individual girls whores and sluts." Morar Dep., 68:24-25, 69:1-5, ECF No. 46 at 73. Upon arrival, in an attempt to control the crowd, the Police Officers of the Reading Police Department directed everyone to disperse. As the students were beginning to do so, Plaintiff shouted out "go to hell lesbo dykes," which caused a minor student to approach Plaintiff in attempt to make physical contact. ECF No. 45 at ¶¶ 36, 38.  It is at that time that Officer Morar warned Plaintiff that if he continues to "rile up" the students, he will be arrested. *Id.* at ¶ 46. Officer Morar, facing a chaotic situation involving minor students, made a judgment call regarding how to maintain law and order. His decision was

---

[4] While Plaintiff argues that *Gilles* has been abrogated, this is factually and legally incorrect. The cases cited by Plaintiff are factually distinct and do not involve the use of the fighting words doctrine. *See Snyder v. Phelps*, 562 U.S. 443, 458 (2011); *see also Matal v. Tam*, 582 U.S. 218, 243 (2017). The Court therefore finds no merit to the argument that *Gilles* is no longer good law.

not plainly incompetent, nor was it a knowing violation of the law, and it is therefore protected under the qualified immunity doctrine.[5]

### 4. Fourth Amendment

Plaintiff also alleges Officer Morar violated his Constitutional rights by arresting him without probable cause in violation of the Fourth Amendment. However, as discussed *supra*, Officer Morar had probable cause to arrest Plaintiff for disorderly conduct based on his use of fighting words. In addition, he is protected under the doctrine of qualified immunity. The Court therefore finds no dispute of material fact on this issue.

### B. False Imprisonment

Plaintiff alleges Officer Morar is liable for false imprisonment based on his warrantless arrest of Plaintiff. In response to Defendant's argument that the arrest was based on probable cause, Plaintiff asserts that since Officer Morar was not present for much of the speech and misheard Plaintiff's "go to hell lesbo dyke" comment, he was not at liberty to arrest Plaintiff for a misdemeanor or summary offense. However, the focus of the analysis is whether Officer Morar had probable cause to believe that an offense was being committed in his presence, not whether he heard the specific comment. *See Commonwealth v. Trunzo*, 589 A.2d 1147, 1150 (Pa. Super. Ct. 1991). Probable cause can stem from an Officer's own observations or from information relayed from others. *Commonwealth v. Schlotthauer*, 61 Pa. D. & C.2d 170, 184 (Somerset Cty. Ct. C.P. 1972).

---

[5] Plaintiff again argues that Defendant's reliance on *Gilles* in support of his qualified immunity argument is misguided, as it was abrogated by *Snyder*. However, *Snyder* did not involve the fighting words doctrine. Additionally, the holding was based upon non-personal public picketing. It has never been expanded to personal targeted attacks during a face-to-face confrontation.

11

Here, as discussed *supra*, under the totality of the circumstances, Officer Morar had probable cause to believe Plaintiff was engaging in disorderly conduct that was likely to incite a breach of the peace, even if he misunderstood Plaintiff's "go to hell lesbo dykes" utterance as "go to hell lesbos." The situation was ongoing and continued to escalate after Officer Morar's arrival. He was informed that the hostility commenced with Plaintiff uttering personally directed insults at the minor students, and Officer Morar was present as he continued to do so. Therefore, he had probable cause to believe Plaintiff was engaging in disorderly conduct and was justified in arresting Plaintiff.[6]

V.  CONCLUSION

For the reasons set forth above, summary judgment must be granted in favor of both Defendants.

An appropriate Order follows.

BY THE COURT:

JOHN M. GALLAGHER
United States District Court Judge

---

[6] Additionally, False Imprisonment is the only remaining claim against the City of Reading. Neither party disputes that this claim fails as a city cannot be held liable for the acts of its police officers under a theory of respondeat superior. *See Randall v. City of Philadelphia*, 2014 U.S. Dist. LEXIS 116429, at *17 (E.D. Pa. Aug. 20, 2014). A plaintiff must instead "show that the City itself, through the implementation of a policy, custom, or practice, caused the constitutional violation." *Id.* The claim therefore fails against the City.